# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| KEITH L. BLUNT, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 7157 |
| | ) | |
| v. | ) | Judge Robert M. Dow |
| | ) | |
| KENNETH BECKER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Keith L. Blunt brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff's remaining claims include false arrest, conspiracy to falsely arrest, state law respondeat superior, and statutory indemnification. Presently before the Court are Defendants' joint motion for summary judgment [83] and Plaintiff's motion for the court to take judicial notice [89]. For the reasons stated below, Defendants' joint motion for summary judgment [83] is granted and Plaintiff's motion for the Court to take judicial notice [89] is denied.

## I. Background[1]

In the early morning hours of August 18, 2007, Plaintiff and his wife, Andretta Crocket, got into an argument at their residence on West Van Buren in Chicago, Illinois. (Defs.' 56.1(a)(3) Statement ¶ 7.) L.B., the 7 year old daughter of Plaintiff and Crocket and T.H., Crocket's 13 year old son, were present at the residence. (*Id.* at ¶¶ 8-9.) At some point, the argument turned into a physical altercation. (*Id.* at ¶ 10.)

---

[1] Local Rule 56.1 requires that statements of fact contain allegations of material fact and that the factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. at 583-85 (N.D. Ill. 2000). In this matter, Defendants filed a Local Rule 56.1(a) Statement of Material Facts. In addition, as certified by Defendants, Defendants served upon Plaintiff the required Local Rule 56.2 Notice to *Pro Se* Litigants Opposing Summary Judgment. Plaintiff filed a response to Defendants' Rule 56.1 Statement and also filed a Statement of Additional Facts.

That same morning, Chicago Police Officers Osborne and Berka were on patrol together in the 15th District. (Defs.' 56.1(a)(3) Statement ¶ 31.) Sometime between 12:30 a.m. and 12:45 a.m., Officers Osborne and Berka were dispatched to Plaintiff's residence to respond to a domestic disturbance. (*Id.* at ¶ 32.) During the initial communication, the dispatcher did not inform Officers Osborne and Berka who placed the 9-1-1 call or whether anyone had been injured. The dispatcher did indicate that there was a domestic disturbance between a girlfriend and boyfriend and that the front door was open. (*Id.* at ¶ 33.) An alert over the police radio approximately five minutes later indicated that the "caller stated his wife was stabbed in the head." The parties dispute whether Officers Osborne and Berka heard the alert. (*Id.* at ¶ 33; Pl.'s response to ¶ 33).

Officers Osborne and Berka were the first police officers to arrive at the residence. (Defs.' 56.1(a)(3) Statement ¶ 34.) Upon arrival, Officers Osborne and Berka were waved down by T.H., who was crying and visibly shaking. (*Id.* at ¶ 35.) Officer Osborne heard T.H. tell them to "hurry up, he is going to kill my mom." (*Id.* at ¶ 37.)

Officers Osborne and Berka quickly proceeded into the residence and observed Plaintiff and Crocket inside the residence. (Defs.' 56.1(a)(3) Statement ¶ 38.) Officers Osborne and Berka observed that Crocket was bleeding from a gash to her head and blood scattered throughout the kitchen. (*Id.*, ¶ 39.) Officer Osborne observed blood on Plaintiff's hands. (*Id.*; Pl.'s response to ¶ 39.)

Officers Berka remained with Plaintiff in the living room while Officer Osborne spoke with Crocket in the kitchen. (Defs.' 56.1(a)(3) Statement ¶ 40.) Crocket told Officer Osborne that she and Plaintiff had been arguing and that Plaintiff started punching her in the head with his fist. (*Id.* at ¶ 41.) Plaintiff also cut her on the head with a knife causing the gash that officers

observed when they first entered the residence. (*Id.* at ¶ 42.) Officer Osborne saw the knife in the kitchen and Crocket identified it as the knife that Plaintiff used to cut her. (*Id.* at ¶ 43.) Crocket told Officer Osborne that she wanted Plaintiff arrested and signed a complaint against him for domestic battery. (*Id.* at ¶ 44.) After speaking with Crocket, Officer Osborne told Officer Berka what Crocket had said. (*Id.* at ¶ 45.) During Officer Osborne's conversation with Crocket, Plaintiff was taken to the bathroom to wash the blood from his hands, handcuffed, and sat on the couch. Following Crocket's statements, Plaintiff was taken to the squad car and transported from the scene. (*Id.* at 47-48; Pl.'s response to ¶¶ 47-48.)

That same morning, at approximately 1:44 a.m., Evidence Technician Officer Dust was assigned to Plaintiff's residence to process the crime scene. Officer Dust arrived at the residence at 1:59 a.m. (Defs.' 56.1(a)(3) Statement ¶¶ 49-50.) Neither Plaintiff nor Crocket was at the residence when Officer Dust arrived. (*Id.* at ¶ 51.). Officer Dust photographed the blood stains in the residence and the knife on the table that was used in the incident. (*Id.* at ¶ 52.) Officer Dust then went to Loretta Hospital and photographed Crocket's face and bandaged head. (*Id.* at ¶ 53.)

Officer Dust was not present when Plaintiff was placed under arrest, did not witness him being arrested, and did not encounter Plaintiff at any point on August 18, 2007. (Defs.' 56.1(a)(3) Statement ¶ 54.) Officer Dust did not speak with Detective Kenneth Becker or Officers Osborne and Berka on August 18, 2007. (*Id.* at ¶ 55.)

On August 18, 2007, Detective Becker was working in the Special Victim's Unit in Area 5 of the Chicago Police Department. (Defs.' 56.1(a)(3) Statement ¶ 57.) Detective Becker was not present when Plaintiff was taken into custody. (*Id.* at ¶ 58.) Detective Becker did not speak

3

with Officers Dust, Osborne, or Berka on August 18, 2007. (*Id.* at ¶¶ 59-60.) Detective Becker interviewed Crocket, T.H., and L.B. at the police station. (*Id.* at ¶ 62.)

## II. Legal Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Factual disputes that are irrelevant to the outcome of the suit "will not be counted." *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003) (quotation marks and citations omitted). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-

movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

**III.    Analysis**

As an initial matter, Plaintiff asks the Court to take "judicial notice" of: (1) his objection to Defendants' photo of a knife and towel from the date of incident, (2) a diagram of the apartment, (3) the fact that there was a table inside the kitchen that could only be seen if a person was "all the way inside the kitchen," (4) that Officer Berka knew that Plaintiff called 9-1-1 and that Crockett had a knife, and (5) that Plaintiff was unable to obtain certain depositions because he is indigent.  The Court cannot take judicial notice of the "facts" offered by Plaintiff.  See *Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998) (a court may take judicial notice of documents contained in the public record, historical documents, and reports of administrative bodies).  Accordingly, Plaintiff's motion [89] is denied.

At the outset, the Court also addresses again whether appointment of counsel for Plaintiff is appropriate at the summary judgment stage of this case.  [See 76, 87 (minute orders previously addressing appointment of counsel issue and noting that the issue would be revisited at later stages of the case)].  After careful consideration, the Court concludes that appointment of counsel is not warranted.  Plaintiff has shown his ability to prosecute his claims through his previous filings with the Court and in his response to the Defendants' motion for summary judgment.  For example, Plaintiff responded to each of Defendants' proposed statements of fact as required by local rule and did so using the correct terminology and legal arguments, *i.e.,* Plaintiff objected to several proposed facts relating to his criminal trial as being "immaterial" to his arrest.  Thus, the appointment of counsel is not required.

Turning to the merits, Defendants argue that Plaintiff's false arrest claim fails because they had probable cause existed to arrest Plaintiff. Probable cause to arrest is an absolute defense to a § 1983 claim against a police officer for a wrongful arrest. *Jackson v. Parker*, 627 F.3d 634, 638 (7th Cir. 2010). "Police ordinarily have probable cause if, at the time of the arrest, the 'facts and circumstances within the officer's knowledge * * * are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect' has committed, is committing, or is about to commit and offense.'" *Wagner v. Washington County*, 493 F.3d 833, 836 (7th Cir. 2007) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). The determination of whether probable cause exists "relies on the common-sense judgment of the officers based on the totality of the circumstances." *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006). The Court may decide if probable cause exists only if the facts underlying the claimed existence of probable cause are not disputed. See *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009).

Under Illinois law,

> A person commits domestic battery if he intentionally or knowingly without legal justification by any means:
>
> 1. Causes bodily harm to any family or household member
. . .
> 2. Makes physical contact of an insulting or provoking nature with any family or household member . . .

750 ILCS 5/12-3/2. When and where Plaintiff was handcuffed and "arrested" is disputed by the parties. Plaintiff avers that he was handcuffed and placed on the couch while Officer Osborne spoke with Andretta in the kitchen; Plaintiff maintains that he was arrested at this time and probable cause failed to exist because the police officers likely heard over the intercom that he had phoned 9-1-1.

Accepting Plaintiff's version as true, Officers Osborne and Berka had probable cause to believe that Plaintiff battered Andretta based on the totality of the circumstances before them. Upon arrival at Plaintiff's residence, Officers Osborne and Berka knew that they were responding to a domestic dispute. When they arrived, they were waived down by T.H. who was crying and visibly shaking. Officer Osborne heard T.H. tell the officers to "hurry up, he is going to kill my mom." When they entered the residence they saw Plaintiff and Andretta inside the residence. They observed that Andretta was wounded, her head was (or at a minimum had been) bleeding from a gash to her head, and blood was scattered throughout the kitchen. Officer Osborne also observed blood on Plaintiff's hands. The fact that the police officers may have known that Plaintiff may have been the person that telephoned 9-1-1 does not negate the scene when the police officers arrived and what they heard and observed immediately thereafter. These undisputed facts demonstrate that Officers Osborne and Berka had probable cause to arrest Plaintiff at his residence.[2]

---

[2] Officers Osborne and Berka also argue that they are entitled to qualified immunity. Under the doctrine of qualified immunity, government officials performing discretionary functions may avoid liability "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1988)). The doctrine of qualified immunity was established to allow government officials to act free from fear of litigation by allowing those officials to anticipate when their conduct gives rise to liability. *Davis v. Scherer*, 468 U.S. 183 (1984). The doctrine shields a public official from liability when he acts in a manner that he reasonably believes to be lawful. *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). The doctrine of qualified immunity provides "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991 (internal quotations omitted). Thus, for the purposes of qualified immunity as related to a false arrest claim, it is sufficient that a police officer even arguably had probable cause. *See Williams v. Jaglowski*, 269 F.3d 778, 781 (7th Cir. 2001). As discussed above, the undisputed facts demonstrate that Officers and Osborne had probable cause to arrest Plaintiff at his residence based on what the officers knew and observed. Thus, Officers Osborne and Berka also are entitled to qualified immunity as to Plaintiff's false arrest claim.

Plaintiff's false arrest claim against Defendants Dust and Becker can be addressed very briefly. Neither Dust nor Becker was present or involved in any manner in Plaintiff's arrest. Accordingly, any false arrest claim against them fails.

Plaintiff also alleges that Defendants conspired to falsely arrest him. To establish a § 1983 claim under a conspiracy theory, Plaintiff must demonstrate "(1) an express or implied agreement among defendants to deprive a plaintiff of his or her constitutional rights and (2) actual deprivation of those rights in the form of overt acts in furtherance of the agreement." *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988). Conspiracy is not an independent cause of action under § 1983. See *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008). Therefore, if there has been no underlying constitutional violation a corollary conspiracy claim fails as a matter of law. See *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000) (holding that "there is no constitutional violation in conspiring to cover-up an action which does not itself violate the Constitution") (internal citation and quotation omitted).

Here, to begin with, there was no underlying constitutional violation for false arrest, so Plaintiff cannot establish a § 1983 conspiracy claim based on the alleged false arrest. Furthermore, even if Plaintiff had established a genuine issue of material fact as to his false arrest claim, his conspiracy claim still would fail as he has not presented any facts demonstrating any type of agreement between Defendants to falsely arrest him. Defendants Dust and Becker were not involved in the arrest and only became involved in the criminal proceedings after Plaintiff was already arrested.

Finally, because Plaintiff has no remaining underlying claims, the City of Chicago is entitled to summary judgment on Plaintiff's respondeat superior and statutory indemnification claims.

**IV.    Conclusion**

For the reasons stated above, the Court concludes that no material facts are in dispute and that Defendants have established that they are entitled to judgment as a matter of law. No reasonable trier of fact could find that Defendants falsely arrested Plaintiff or conspired to do so. Accordingly, Defendants' joint motion for summary judgment [83] is granted. The Clerk of Court is directed to enter judgment in favor of Defendants pursuant to Fed. R. Civ. P. 56. Plaintiff's motion for the court to take judicial notice [89] is denied. This case is closed.

If Plaintiff wishes to appeal this final judgment, he may file a notice of appeal with this court within thirty days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues Plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If Plaintiff does choose to appeal, he will be liable for the $455 appellate filing fee irrespective of the outcome of the appeal. *Evans v. Illinois Dept. of Corrections*, 150 F.3d 810, 812 (7th Cir. 1998). Furthermore, if the appeal is found to be non-meritorious, Plaintiff may also be assessed a "strike" under 28 U.S.C. § 1915(g). The Plaintiff is warned that, pursuant to that statute, if a prisoner has had a total of three federal cases or appeals dismissed as frivolous, malicious, or failing to state a claim, he may not file suit in federal court without prepaying the filing fee unless he is in imminent danger of serious physical injury.

Dated:  May 2, 2011                                                    _____
                                                                                           Robert M. Dow, Jr.
                                                                                           United States District Judge

9